# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-1660V
Filed: February 7, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | | |
| K.L., | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | |
| v. | * | Finding of Facts; Onset; Tetanus- |
| | * | diphtheria-acellular pertussis ("Tdap") |
| SECRETARY OF HEALTH | * | Vaccine; Shoulder Injury Related to |
| AND HUMAN SERVICES, | * | Vaccine Administration ("SIRVA") |
| | * | |
| Respondent. | * | |
| | * | |
| | * | |
| * * * * * * * * * * * * * * * | | |

*Ronald Homer, Esq*., Conway, Homer, P.C., Boston, MA, for petitioner.
*Alec Saxe, Esq*., U.S. Department of Justice, Washington, DC, for respondent.

## RULING ON ONSET[1]

**Roth**, Special Master:

On November 1, 2017, K.L. ("petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleged that as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination she received on November 14, 2014, she developed a shoulder injury related to vaccine administration ("SIRVA"). Petition at 1, ECF No. 1.

---

[1] Although this Ruling has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Petitioner did not seek any care for her alleged injury until July 20, 2015, eight months after the Tdap vaccination. For the reasons discussed below, I find that petitioner had an onset of left shoulder pain in February/March of 2015.

## I.    Procedural History

The petition was filed on November 1, 2017 and assigned to the Special Processing Unit ("SPU") on November 2, 2017. *See* Petition, ECF No. 1; Notice of Assignment, ECF No. 4. On November 6, 2017, petitioner filed medical records, her affidavit, and affidavits from her husband and daughter. *See* Petitioner's Exhibits ("Pet. Ex.") 1-13, ECF Nos. 6-7.

Following the initial status conference on December 21, 2017, petitioner was ordered to file additional medical records and a supplemental affidavit. Scheduling Order, ECF No. 11.

Respondent filed several status reports ("Resp. S.R.") requesting additional time to review petitioner's medical records. *See* Resp. S.R., ECF Nos. 15, 17, 21, 23. On October 17, 2018, respondent filed a status report advising that he was not interested in discussing settlement. Resp. S.R. at 1, ECF No. 25.

Respondent filed his Rule 4(c) Report ("Resp. Rpt.") on March 5, 2019, recommending against compensation in this matter. ECF No. 27. Respondent submitted that petitioner's claim did not satisfy the criteria for an on-Table SIRVA injury. Resp. Rpt. at 6. Specifically, respondent submitted that the contemporaneous medical records "demonstrate that she did not seek treatment for left shoulder pain until July 20, 2015, more than eight months after her vaccination." *Id*. at 5. Further, he noted that "[d]espite much contact and several appointments with medical providers between December 2014 and June 2015, petitioner did not report left shoulder pain." *Id*.

This matter was reassigned to me on March 15, 2019. ECF No. 29. A status conference was held on June 26, 2019, after which petitioner was ordered to file her relevant browser history. Scheduling Order, ECF No. 30.

Following additional filings by petitioner, including her browser history, an Onset Hearing was scheduled for October 19, 2020. Pet. Ex. 15-16, ECF Nos. 32, 36, 39. Petitioner filed a second supplemental affidavit on September 10, 2020. Pet. Ex. 19, ECF No. 43.

An onset hearing was held via video conference on October 19, 2020. Petitioner, her husband, and her daughter testified.

Following the hearing, additional evidence was filed by petitioner. Pet. Ex. 21-27, ECF Nos. 55-56, 59. A status report confirming that all records petitioner wanted considered was filed on March 26, 2021. ECF No. 61.

This matter is now ripe for Ruling on Onset.

## II.      The Factual Record

### A.      Petitioner's Medical Records

#### i.   Petitioner's Pre-Vaccine Medical History

Petitioner's past medical history includes but is not limited to shoulder and back pain and persistent eczema.[3] Petitioner received prior immunizations including flu and MMR vaccines without event. Pet. Ex. 1 at 2. Petitioner presented for acupuncture treatments for left shoulder pain and TMJ (temporomandibular joint) on four occasions in 2005. *See* Pet. Ex. 18 at 9.

Petitioner presented to and/or communicated with her medical providers on a regular basis. Communications with providers were either through the patient portal or by telephone. Pet. Ex. 2 at 4-5, 7-8, 10-11, 13, 25-26, 28, 32-33, 35-36; Pet. Ex. 3 at 8-9, 15-17, 63, 210.

Dr. Hoang was petitioner's primary care physician ("PCP").  She presented to and communicated with Dr. Hoang about persistent rashes, blood work results, requests for antibiotics, and prednisone.[4] Pet. Ex. 3 at 21-29, 38, 43, 134, 147, 149, 158. When petitioner communicated with Dr. Hoang about a complaint, if Dr. Hoang suggested she come for an appointment, she would present as directed. Pet. Ex. 3 at 67, 72.   Petitioner did the same with other doctors with whom she treated in the medical system. For example, petitioner emailed or telephoned Dr. Lindgren, the gynecologist, or staff for prescription refills or antibiotics for new onset of yeast infection. Pet. Ex. 3 at 101, 118, 131, 182, 210, 216, 226.

When necessary, petitioner would email Dr. Hoang asking for a referral.  For example, on September 3, 2013, petitioner emailed Dr. Hoang for a referral to a dermatologist regarding moles. Pet. Ex. 3 at 134. Petitioner then visited the dermatologist she was referred to, Dr. Wong, for eczema. *Id.* at 166.

In the year prior to the subject Tdap vaccine, petitioner engaged in an email exchange with Dr. Hoang on December 11, 2013 to discuss her thyroid levels and thyroid medication. *Id.* at 237. She visited Dr. Wong for her eczema on December 23, 2013, at which time she had a dermatologic procedure. *Id.* at 241, 247.

On January 10, 2014, petitioner emailed Dr. Wong, asking if prednisone would help with her eczema. Pet. Ex. 3 at 249. She emailed Dr. Wong again on January 16, 2014, requesting a refill of Clobetasol. *Id.* at 259. On February 12, 2014, petitioner emailed NP Hettig asking for Diflucan/fluconazole to treat a yeast infection. *Id.* at 277. On March 4, 2014 she emailed Dr. Wong to cancel an appointment because her rash had resolved and specialty visits cost $130.00. *Id.* at 285. On May 23, 2014, petitioner emailed Dr. Hoang to schedule bloodwork. *Id.* at 289-90. Petitioner called Dr. Rangel on June 20, 2014 requesting medication. *Id.* at 298. On November

---

[3] Eczema is any of various pruritic, papulovesicular types of dermatitis occurring as reactions to endogenous or exogenous agents. *Dorland's Illustrated Medical Dictionary* 586 (33rd ed. 2019) [hereinafter "*Dorland's*"].

[4] Prednisone is a synthetic glucocorticoid derived from cortisone, administered orally as an anti-inflammatory and immunosuppressant. *Id.* at 1486.

11, 2014, petitioner emailed Dr. Hoang requesting that bloodwork in addition to routine labs be done at her upcoming appointment. *Id.* at 303.

### ii. Petitioner's Receipt of the Tdap Vaccine

Petitioner received the subject Tdap vaccine her left deltoid at her November 14, 2014 visit with Dr. Hoang.  Pet. Ex. 1 at 2; Pet. Ex. 3 at 319.

### iii. Petitioner's Post-Vaccine Medical History

On December 22, 2104, petitioner presented to NP Hettig for a routine gynecological examination. Pet. Ex. 3 at 329. Her active problems were listed as "depression, major, recurrent, eczema, hx of abnl pap smear, hyperlipidemia."[5] *Id.* at 329-30. Her receipt of a Tdap vaccine was noted. *Id.* at 330.

That same day, petitioner emailed a picture of a mole to Dr. Hoang asking if she needed to be seen. *Id.* at 346. She emailed Dr. Hoang for a prescription refill on January 12, 2015. Pet. Ex. 3 at 351. She presented to Dr. Hoang on March 17, 2015 for examination of the previously pictured mole. *Id.* at 359. On June 2, 2015, petitioner emailed NP Hettig for prescription refill. *Id.* at 366.

On July 20, 2015, over eight months after receipt of the Tdap vaccination, petitioner presented to Twin Creeks Chiropractic complaining of neck and left shoulder pain since the Tdap vaccine in September 2014[6] with neck pain on and off for over 15 years. Pet. Ex. 7 at 4. Petitioner completed a Functional Rating Index form on July 14, 2015 in anticipation of her first visit reporting "moderately disturbed sleep," and "no pain" related to personal care like dressing and able to participate in most activities. *Id.* at 27-28. Petitioner thereafter presented for chiropractic treatment 19 times through January 14, 2016. *See generally* Pet. Ex. 7.

Petitioner presented over 10 times between September 2, 2015 and October 20, 2015, for cryotherapy[7] for shoulder, knee, and back pain. Pet. Ex. 8. On October 11, 2015, petitioner presented to NP Holtz for a cat bite to her right hand. Pet. Ex. 5 at 2. The visit notes indicated that petitioner was up to date on her tetanus immunization. *Id.* She presented for an itchy rash on October 20, 2015. *Id.* at 4.

On December 9, 2015, petitioner presented to a new PCP, Dr. Currier, for a physical due to insurance change. She reported that she suffered from eczema, a lesion on her neck, and a bleeding mole. Pet. Ex. 5 at 6. Her active problems were listed as thyroid activity decreased, eczema, and heart murmur. *Id.* at 7-8. She did not report left shoulder pain or Tdap reaction.

---

[5] Hyperlipidemia is a term for elevated concentrations of any or all lipids in the plasma. *Id.* at 880.
[6] The Tdap vaccine was administered on November 14, 2014, but petitioner had a flu vaccine in September of 2014. Petition at 1; Pet. Ex. 1 at 2.
[7] Cryotherapy is the therapeutic use of the cold and is also called "cold therapy." *Dorland's* at 433.

Petitioner presented for Bowen therapy[8] on February 8 and 15, 2016 to her upper thoracic[9] area and left shoulder. Pet. Ex. 9. There are no treatment records, only a letter dated June 1, 2017 from Jane Sarro, CMT which states: "Procedure: Bowen therapy to upper thoracic and left shoulder. Complaining of pain in the left shoulder since Tdap shot in 11/14/14." The basis for the letter and its contents is unknown. *Id.* at 2.

Petitioner visited PA Pabon on February 22, 2016 reporting left shoulder pain for one year which started after Tdap vaccine. Pet. Ex. 5 at 9. Petitioner reported suffering from a bad reaction (swelling, pain, mild fever, decreased range of motion) following the Tdap vaccine, but did not see anyone for it. *Id.* Petitioner reported that two months ago, the pain began worsening with aches while sleeping, worse with exercise, and bad when putting on a seatbelt or jacket. *Id.*

On March 16, 2016, petitioner presented to Dr. Tweet for left shoulder pain that "started after a TDAP" and "has gotten worse. Lost motion." Pet. Ex. 4 at 2-6. Petitioner reported pain present for one year that was constant but made worse by activity and at night. *Id.* X-rays were negative/normal. *Id.* The impression was left shoulder adhesive capsulitis,[10] also known as frozen shoulder. *Id.* Petitioner received a cortisone injection.[11] *Id.* at 5.

A letter[12] from petitioner's acupuncturist documented that petitioner presented on April 1, 2016 reporting onset of pain and limited range of motion of her left shoulder that started a year prior to her April 1, 2016 visit. Pet. Ex. 18 at 9. She had "a shot" a few weeks before that did not help. *Id.* She presented for 8 acupuncture treatments through November 14, 2016 and was improving. *Id.* She did not return until February 10, 2018. *Id.* The records reflect left frozen shoulder for 1 year. Pet. Ex. 6 at 4. Petitioner filled out the Registration Update form documenting

---

[8] Bowen therapy involves gently stretching the soft tissue that covers all your muscles and organs in order to relieve pain. It uses precise and gentle, rolling hand movements, focusing on the muscles, tendons, and ligaments, along with the fascia and skin around them. Healthline, *What is Bowen Therapy?*, https://www.healthline.com/health/bowen-therapy.

[9] The term "thoracic" pertains to or affects the chest. *Dorland's* at 1890.

[10] Adhesive capsulitis is adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder with obliteration of the subdeltoid bursa, characterized by shoulder pain with general onset, with increasing pain, stiffness, and limited motion. *Id.* at 281.

[11] A cortisone injection is a shot typically injected into joints and is meant to relieve pain and inflammation. Mayo Clinic, *Cortisone Shots: Overview*, https://www.mayoclinic.org/tests-procedures/cortisone-shots/about/pac-20384794.

[12] Petitioner communicated with Village Acupuncture in writing including content from her attorney and asking that the acupuncturist, Noriko, provide a short statement addressing the information requested by her attorney. Pet. Ex. 18 at 8. In response, a letter signed by Noriko and dated February 19, 2018 stated that petitioner first presented on September 10, 2005 with complaints of left shoulder pain, stress, and occasional headaches. *Id.* at 9. Following receipt of the letter from Village Acupuncture, petitioner emailed the facility denying that she had shoulder pain in 2005 and writing that she was trying to "establish that [her] shoulder pain did not start until 2016. Could you please omit the shoulder pain in 2005 from the letter?" *Id.* at 10. In a response email, the office manager advised petitioner that because the record of shoulder pain was in the chart note, it would not be omitted from the letter. *Id.* at 11. By email dated February 22, 2018, petitioner responded that when the 2005 record was read to her, there was never a mention of shoulder pain. *Id.* at 12. In response, petitioner was advised that it was mentioned in the 2005 record and noted as "not severe." *Id.* at 13.

frozen shoulder (left) from vaccine injury. *Id.* at 5.

Petitioner had multiple encounters and/or communications through the patient portal or by telephone with her medical providers, including Dr. Hoang, throughout 2016. She did not mention left shoulder pain. Pet. Ex. 3 at 371-73, 383, 386, 389, 392-93.

Petitioner returned to Dr. Hoang on August 31, 2016 for a routine physical. Pet. Ex. 3 at 414. The record notes, "adhesive capsulitis of left shoulder . . . continue range of motion exercise. Was diagnos[ed] with left frozen shoulder last year at Sutter. Saw orthopedics with injection, acupuncture, and doing home exercises. Also significantly better. Still mild discomfort but range of motion is back to normal." *Id.* at 415.  There was no mention in the record that her left shoulder issue was related to the Tdap vaccine she had received at Dr. Hoang's office on November 14, 2014.

Petitioner presented for acupuncture for her left shoulder on September 7, 2016, but the notes are mostly illegible. Pet. Ex. 6 at 2. The record for her visit on November 14, 2016, documents that petitioner "raced on monkey bars yesterday" and had left shoulder pain. Pet. Ex. 18 at 7.

In the following months, petitioner continued to present, email through the patient portal, and telephone her medical providers regarding her health, laboratory results, articles she had read, research she had done and metallic allergies she believed she had caused by her contraceptive device, surgical removal of the device and questions about the foregoing and new medications. Pet. Ex. 3 at 427, 442-43, 450, 456, 477, 490; Pet. Ex. 17 at 23, 41, 42, 58, 66, 105, 115, 143, 177, 203.

Petitioner emailed Dr. Tzoumas on January 30, 2018, informing the doctor that her recent CT scan showed mild arthritis and asking if a recent car accident could have exacerbated her arthritis. Pet. Ex. 17 at 293.

Petitioner returned to acupuncture on February 10, 2018, 15 months since her last visit, reporting a car accident and frozen shoulder from a vaccine injury. Pet. Ex. 18 at 6, 9.

**B.    Affidavits and Testimony of the Petitioner and Witnesses**

**i.   Affidavits and Testimony of Petitioner, K.L.**

Petitioner submitted three affidavits in this matter and testified at hearing. *See* Pet. Ex. 10, 14, 19.

In her first affidavit, petitioner affirmed receipt of a Tdap vaccine in her left shoulder at her annual physical on November 14, 2014. Pet. Ex. 10. The following morning, she was nauseous, had a low-grade fever, and extreme arm pain. *Id.* She called her daughter, who was studying to be a physician's assistant at the time and told her about her symptoms. *Id.* Her daughter said the symptoms were likely due to her shot the day before. *Id.* She affirmed having pain over the next two weeks, taking over the counter medication and having limited range of motion with sharp pain

6

if she tried to push past her limits. *Id.* at 2-3. She did not contact her physician because she "felt that [she] knew what the cause of [her] symptoms was, and [she] did not want to spend at least $80 for another appointment." *Id.* at 3.  The pain kept her from fully participating in regular activities, such as yoga, driving a car, and sleeping. *Id.* at 3-4. She tried chiropractic care in the summer of 2015 when her range of motion issues persisted. *Id.* at 4. She attended several sessions without relief. The chiropractor "mentioned the possibility of frozen shoulder" in September 2015. *Id.* According to petitioner, "I researched online, and I found that it was not uncommon to develop frozen shoulder as a result of a vaccine."[13] *Id.*

Petitioner affirmed that she then went for cryotherapy after which she saw her primary doctor for a referral to a specialist. Pet. Ex. 10 at 4. She then presented to an orthopedist who ordered an x-ray and administered a cortisone injection in her shoulder, which did not provide any relief.  *Id.* Petitioner began acupuncture in April 2016, which helped with her pain. *Id.* She still has "difficulty with certain motions and positions." *Id.* at 5.

In a second affidavit, petitioner affirmed having left shoulder difficulties ever since the Tdap vaccine in November 2014. Pet. Ex. 14 at 2. She described extreme pain the morning after the vaccine and called her daughter who was then in a physician's assistant program. *Id.* Her daughter "has been a good resource for medical questions when I do not feel something requires formal medical attention." *Id.* According to petitioner she attends routine medical follow-ups but does not visit the doctor often between scheduled visits due to her high insurance copays. *Id.* She presented for a gynecology exam and mammogram in December of 2014.  She did not mention her shoulder pain at these visits because it was not relevant to her gynecological care and had not yet progressed to frozen shoulder. *Id.* at 2-3. She continued taking over the counter pain medication to self-treat her shoulder pain to avoid spending money to see a doctor. *Id.* at 3.

Petitioner affirmed seeing her doctor in March of 2015 for a concerning mole but did not mention her shoulder pain so as not "…to incur more medical expenses." Pet. Ex. 14 at 3. Her pain got worse as time passed and affected her activities and her sleep.  She would have seen a doctor at that time but had to switch health plans. *Id.* at 4. She spoke to a friend and sought treatment from a chiropractor. *Id.* She learned her symptoms were from frozen shoulder. *Id.*

In a final affidavit, petitioner affirmed being "very concerned about incurring additional expenses", so she tried to manage her pain on her own. Pet. Ex. 19 at 2. According to petitioner if she raised a complaint unrelated to what she was at the doctor for, she could be billed additional costs. She had previously learned from the billing department that "any time something other than what is covered in a scheduled exam is discussed, it can result in additional billing." *Id.* at 2-3. This was the reason she did not bring up her shoulder pain in the visits after her vaccination. *Id.* Petitioner sought her daughter's advice along with alternative treatment, like yoga, cryotherapy, and chiropractic treatment. *Id.* at 3. Petitioner still was not symptom free and had a clicking sensation and range of motion difficulty in her shoulder. Pet. Ex. 19 at 3-4.

---

[13] Petitioner was ordered to file her relevant browser history after the subject vaccine. Scheduling Order, ECF No. 30, 52. The first search provided was on October 21, 2015 when petitioner visited www.webmd.com. Petitioner has not provided any search history from September 2015 or prior thereto following the Tdap vaccination. *See generally* Pet. Ex. 16.

Petitioner testified at hearing to receiving the Tdap vaccine in her left arm at her annual physical on November 14, 2014. Tr. 22-24.  When she awoke the next morning, her arm was very sore, hot to the touch, and she was unable to lift it. Tr. 25-26. She told her husband and her daughter about her pain. Tr. 26. Her daughter told her it may be side effects from the vaccine. Tr. 27. Petitioner stated that her arm was hot to the touch for only a few days, but her arm pain persisted. Tr. 27-28, 30. She self-treated with ice and ibuprofen for the "next few weeks." Tr. 28. Her sleep was impacted by the shoulder pain, particularly "after getting the frozen shoulder." Tr. 30. By January 2015, her pain was dull rather than intense. Tr. 30.

Petitioner did not mention her shoulder pain to either to NP Hettig or Dr. Hoang at visits in December 2014 or March 2015. Tr. 34, 51, 53. She stated that her shoulder was not in the forefront of her mind, and she did not want to incur any extra costs for bringing up a concern unrelated to the reason for the appointment. Tr. 34, 51-52. She was also angry with Dr. Hoang because she had to wait a long time in his office when he failed to tell his nurse to give her the vaccine and because she "felt that he was the cause" of her shoulder pain. Tr. 74-75.

Petitioner stated in mid-May 2015 her shoulder started hurting constantly. Tr. 35. She had trouble getting dressed on her own, could not wear shirts that went over her head, and had a hard time blow drying her hair. Tr. 37-38. The month of May stuck out to her because it was around the time of high school graduation at the school where she worked. Tr. 104-05. She also recalled her work friend Gina recommending a chiropractor for her shoulder pain around that time. Tr. 101-02.

Petitioner presented to the chiropractor Gina recommended in July 2015. Tr. 39. The chiropractor informed her that he thought she had frozen shoulder. Tr. 41. Petitioner also tried Bowen therapy and cryotherapy to treat her shoulder. Tr. 41-42.

Petitioner stated that she had her first annual physical exam with Dr. Currier on December 9, 2015 due to a change in insurance. Tr. 58; *See* Pet. Ex. 5 at 6. She did not tell Dr. Currier about her shoulder pain because this visit was only for preventative care. Tr. 58-59. "[I]f I mention anything outside of preventative care, I am charged, and preventative care is free unless you bring up another issue." Tr. 59.  It was noted that she did advise Dr. Currier about her eczema and concern for a mole. Tr. 59. Petitioner responded that she did not mention her shoulder pain because she "did not want to be charged extra" and she "didn't feel the need to mention it to [Dr. Currier] because [she] was getting treatment through the chiropractor." Tr. 59-60.

Petitioner testified that the first time she mentioned shoulder pain to one of her routine medical providers was in 2016 when she sought a referral for a cortisone injection which did not provide any relief but cost her $500.00. Tr. 42-44. She then tried acupuncture, which helped with the pain. Tr. 44-45. Her last acupuncture visit was in November 2016 after which she was "able to maneuver [her] shoulder . . . without excruciating pain" but still had some range of motion limitations. Tr. 45.

Petitioner stated that she does "a lot of research on the internet." Tr. 113. She also uses the patient portal frequently because you don't have to pay to ask a provider a question through the patient portal. Tr. 70. Respondent's counsel asked whether petitioner could have used the patient

portal to ask her primary for a referral to an orthopedic doctor. She said she could, but the doctor would have wanted to see her first; "he can't just make the referral over the portal." Tr. 71.

Petitioner estimated that she spent around $2,500.00 out-of-pocket on alternative treatments for her shoulder. Tr. 93.

### ii. Affidavit and Testimony of Petitioner's Husband, D.L.

D.L. submitted one affidavit and testified at hearing. *See* Pet. Ex. 12.

D.L. affirmed that the day after her Tdap vaccine, petitioner complained of pain and not feeling well. Pet. Ex. 12 at 2. They had plans to go to the movies that evening, but petitioner did not feel well enough to go. *Id.* Her shoulder pain got worse and certain activities, like yoga, were more difficult. *Id.*

According to D.L., petitioner did not go to a doctor because she did not think the doctor would be able to help her since the symptoms were triggered by the vaccination. Pet. Ex. 12 at 3. They also had a high deductible insurance plan. *Id.* According to D.L., eventually, petitioner's daily activities, like sleeping, driving, and dressing, were affected by her shoulder pain and he "frequently woke up in the night to hear [petitioner] moaning and crying in pain because of her shoulder." *Id.* Petitioner's shoulder is still not back to normal. *Id.*

At the hearing, D.L. stated that he was surprised petitioner received a vaccine in 2014 because "she was very much actually against those." Tr. 157-58. He was further surprised that petitioner received a flu shot in September 2014 because "she was always really against the flu shot." Tr. 159.

According to D.L., petitioner experienced flu-like symptoms, a mild-fever, and a sore arm the day after the Tdap vaccine and did not feel well enough to go to the movies that evening, which "never happens." Tr. 161-63. He told her that her arm pain would probably go away and recommended that she ice her shoulder. Tr. 164. By the end of the weekend, most of her symptoms had resolved except for the shoulder pain. Tr. 164. Petitioner continued icing her shoulder three to four times a week for the next couple of weeks. Tr. 164, 165. He did not suggest that she seek medical care because he assumed that the pain would go away. Tr. 166-67.

D.L. described petitioner's shoulder pain in the weeks that followed as "an annoyance". Tr. 166, 173. At first, he stated that between December 2014 and May 2015, petitioner was unable to participate fully in her exercise routine and was never without pain. Tr. 174-75, 187. He then stated that in May or June of 2015, petitioner's pain became worse, and she would wake up in the middle of the night crying from sleeping on her shoulder. Tr. 171. That is when he first noticed that petitioner was having trouble putting on her seatbelt and her coats and requested his help with household chores, like cleaning out their cats' litter box. Tr. 172, 178-79, 180.

D.L. stated that petitioner began chiropractic treatment in July 2015 after her friend recommended it. Tr. 177. The chiropractor mentioned frozen shoulder at one of their appointments, and petitioner "started looking into it and started telling [D.L.] about it." Tr. 195-96. However, the

chiropractor and Bowen therapy did not help petitioner's pain. Tr. 180-81. Near the beginning of 2016, D.L. recalled that petitioner got a cortisone shot, which he took as a sign of her desperation to get relief as none of the alternative therapies were helping. Tr. 182, 194-95. D.L. could not recall when petitioner first mentioned that her shoulder pain could have been a result of the vaccine she received. Tr. 198. He also could not remember when petitioner first talked to attorneys about a vaccine claim. Tr. 198.

D.L. stated that petitioner lived with shoulder pain from November 2014 until a few months after the cortisone shot in early 2016 with little relief. Tr. 222-23. Her shoulder still makes a "cracking" or "popping" sound, but "it's not something present-day where it's affecting her." Tr. 203.

### iii.   Affidavit and Testimony of Petitioner's Daughter, A.E.

A.E. submitted one affidavit and testified at the hearing. *See* Pet. Ex. 13.

A.E. affirmed that the day after her Tdap vaccination petitioner called her and complained that she did not feel well and had pain in her arm which sounded to her like the typical side effects of a vaccine. Pet. Ex. 13 at 2. However, petitioner's pain became increasingly worse over time and petitioner called her and said she could not lift her arm and was unable to do daily tasks or exercise. *Id.* at 3. A.E. was home for the holidays in 2014 and witnessed firsthand all the symptoms petitioner had been describing over the phone. *Id.*

A.E. affirmed examining her mother's arm in June of 2015 and petitioner was unable to "abduct or extend her arm above or behind her without excruciating pain." Pet. Ex. 13 at 3. At that point in time, petitioner had already tried chiropractic care, cryotherapy, Bowen therapy, and massages. *Id.* A.E. recommended that petitioner get a cortisone injection. *Id.*

A.E. testified that she talked to her mother on the phone or through text messages at least once a day from 2013 to 2016. Tr. 121. Prior to her vaccination, her mother was active, healthy, rarely needed to see a doctor, and rarely spoke about any health problems. Tr. 122. A.E. recalled the phone call with petitioner the day after the Tdap vaccine in November 2014, when her mother told her she had flu-like symptoms after a Tdap vaccine the day before. Tr. 123. A.E. advised her to rest, take ibuprofen, and ice her shoulder. Tr. 123. She did not deem her mother's symptoms severe enough to seek medical attention at that time. Tr. 124.

A.E. stated when she came home for the holidays in 2014, petitioner was in a "lot of pain" having difficulty buckling herself in the car and putting on jackets. Tr. 125-26. A.E. did not recommend that her mother visit a medical provider because there was not much that could have been done for those symptoms. Tr. 126. A.E. stated that side effects from vaccination typically resolve within a week or two. Tr. 127. However, hypothetically, if someone had presented to the emergency room where she works as a PA with those complaints, A.E. would have referred them to an orthopedic doctor. Tr. 127-28. A.E. stated that the only treatment that came to mind was a cortisone injection and she knew petitioner would not be interested, knowing her mother prefers a "holistic approach" to medical care. Tr. 128.

A.E. testified that the next time she saw petitioner in person was in June 2015 when petitioner visited Philadelphia for a week. Tr. 130. At that time, petitioner was still struggling to buckle her seatbelt and put on jackets. Tr. 131. A.E. did a brief hands-on examination of petitioner's range of motion and found that "she was having trouble flexing the shoulder, bringing the arm up, and having trouble bringing the arm across and back." Tr. 132-33. A.E. mentioned "frozen shoulder" to her mother at some point "after she saw a chiropractor." Tr. 133.

According to A.E., petitioner's pain was always "consistently the same"; it did not ebb and flow, going from dull to intense and extreme. Tr. 147. She believed petitioner had undergone massage therapy, Bowen therapy, cryotherapy, and chiropractic treatment by the time she visited Philadelphia in June 2015; thus, A.E. recommended that petitioner get a cortisone injection. Tr. 148-50.

### C.   Additional Evidence

#### i.   Internet Search History

On September 25, 2019, prior to hearing, petitioner submitted her internet search history. Pet. Ex. 16. On October 21, 2015, petitioner conducted her first search on webmd.com/vaccines, a year after her Tdap vaccine. *Id.* at 4. She conducted a second search on November 9, 2015, for "arm never recovered after tdap shot" and visited a website called "vactruth.com." *Id.* at 2-3. On January 27, 2016, petitioner searched "shoulder pain due to tdap" and "pain in shoulder when reaching back." *Id.* at 5-6. On February 11, 2016, she searched "shoulder pain from tdap" and "what type of doctor do I need to see for shoulder pain?" *Id.* at 7, 10. That day, she also visited a webpage discussing the Tdap vaccine and lasting shoulder pain, as well as a vaccine-injury attorney's website. *Id.* at 8-9.

On March 19, 2016, petitioner watched a YouTube video on yoga for frozen shoulder. Pet. Ex. 16 at 11. A few days later, on March 21, 2016, petitioner searched "how to heal a frozen shoulder." *Id.* at 13. She also visited a website discussing frozen shoulder symptoms and treatment. *Id.* at 14. She again searched for treatments for frozen shoulder on March 28, 2016. *Id.* at 12.

No other searches were filed.

### III.   Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing her claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created

contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

## IV.     Discussion and Specific Findings of Fact

Petitioner alleges to have suffered a SIRVA that began the day following a Tdap vaccination received on November 14, 2014. Petition at 1.

As evidenced by the medical records, petitioner is vigilant about her health and sees or communicates with medical professionals of various specialties including her primary care physician through the patient portal, routinely updating her providers on her health, asking questions, seeking advice on medical issues, reporting changes to her health, requesting prescription refills, asking to try new medications she has learned about, discussing her lab results, and providing research or articles she has read and questioning how they affect her health and /or conditions. *See generally* Pet. Ex. 3.  Following her Tdap vaccination on November 14, 2014, petitioner did not mention to or seek any care from a medical professional or other care provider for over 8 months, despite visits and continued communications with her various medical providers through the patient portal. *Id*. at 329-30, 346, 351, 359, 366.

Petitioner had several explanations for the foregoing, including: receiving medical advice from her daughter who was in school studying to be a physician's assistant; a high insurance deductible; the cost associated with seeing a specialist; being charged for mentioning an unrelated problem at a visit for another issue; knowing that the vaccine was the cause of the her pain; being angry with Dr. Hoang for making her wait so long in his office to receive the vaccine; her pain was Dr. Hoang's fault; and her shoulder was not in the forefront of her mind. Tr. 26-28, 30, 34, 52-52, 74-75; *see also* Pet. Ex. 10, 14, 19. Further, according to petitioner, it was not until mid-May of 2015 that her shoulder started hurting constantly and she had trouble getting dressed. Tr. 35.

However, despite petitioner's concerns over the cost of treatment, she pursued alternative treatments including chiropractic, cryotherapy, Bowen therapy, and acupuncture—none of which was covered by insurance, and which cost her personally over $2,500. Pet. Ex. 8; Pet. Ex. 9; Pet. Ex. 5; Pet. Ex. 18.

Additionally, once petitioner presented for care of her left shoulder, she reported various dates of onset. Petition at 3; *see* Pet. Ex. 3; Pet. Ex. 7 at 4; Pet. Ex. 5 at 9; Pet. Ex. 4 at 2-6; Pet. Ex. 18 at 9. When she presented to the chiropractor on July 20, 2015, she reported neck pain off and on for over 15 years and left shoulder pain since a Tdap vaccine in September of 2014. The Tdap vaccine was administered on November 14, 2014, placing onset two months before the subject Tdap vaccine.[15] Pet. Ex. 7 at 4. She presented over 10 times between September 2, 2015 and October 20, 2015 for cryotherapy to an unspecified shoulder, mid back, lower back and/or knee. Pet. Ex. 8 at 2-3. There is no mention of her Tdap vaccination. On December 9, 2015, petitioner presented to a new PCP, Dr. Currier, for a physical examination and provided a history of eczema, a lesion on her neck, and a bleeding mole. Pet. Ex. 5 at 6. Her active problems were listed as thyroid activity decreased, eczema, and heart murmur. *Id.* at 7-8. She did not report left shoulder pain or a reaction to the Tdap vaccine. Petitioner presented for Bowen therapy on February 8, 2016 and February 15, 2016. There are no treatment records for these visits—only a

---

[15] D.L. testified to petitioner receiving a flu vaccine in September of 2014 and the Tdap in November of 2014, which surprised him. Tr. 157-159; *see also* Pet. Ex. 1 at 2.

letter dated June 1, 2017 from Jane Sarro, CMT which states: "Procedure: Bowen therapy to upper thoracic and left shoulder. Complaining of pain in the left shoulder since Tdap shot in 11/14/14." The basis for the letter and its contents written well over 15 months after treatment is unknown. Pet. Ex. 9 at 2; Pet. Ex. 23 at 3. Petitioner presented to PA Pabon on February 22, 2016, reporting one year of left shoulder pain following a bad reaction to a Tdap vaccine, placing onset in February 2015, roughly three months after vaccination. Pet. Ex. 5 at 9. Petitioner further reported at that visit she suffered pain, swelling, mild fever, and reduced range of motion of her arm following the vaccine but did not seek any care. *Id.* Two months ago, the pain began worsening with aches while sleeping and was worse with exercise and bad putting on a seatbelt or jacket, placing onset in December of 2015, 13 months after the vaccination. *Id.* On March 16, 2016, petitioner presented to Dr. Tweet and reported left shoulder pain that "started after a Tdap" and "has gotten worse. Lost motion" with pain present for one year that was constant and made worse by activity and at night, placing onset in March of 2015. Pet. Ex. 4 at 2-6. On April 1, 2016, petitioner reported to the acupuncturist that she had shoulder pain and limited range of motion which began one year prior to the appointment or in April of 2015, five months after vaccination. Pet. Ex. 18 at 9; *see also* Pet. Ex. 6 at 4. When petitioner returned to Dr. Hoang on August 31, 2016, she reported that she was diagnosed with adhesive capsulitis at Sutter in 2015. She did not mention the onset of shoulder pain following a Tdap vaccination to Dr. Hoang.[16] Pet. Ex. 3 at 414-15.

Petitioner, D.L., and A.E. testified and affirmed that petitioner did not feel well the day following receipt of the Tdap vaccination and had arm pain/soreness of her left arm from the vaccine. Other than the testimony and affirmations of petitioner and her witnesses, there is no support in the record that petitioner suffered ongoing pain thereafter that affected her activities of daily living or sleep. Once petitioner presented for care of her left shoulder pain, she consistently reported onset of her pain as being in February/March of 2015 and intensifying in May of 2015. Petition at 3; *see generally* Pet. Ex. 3; Pet. Ex. 7 at 4; Pet. Ex. 5 at 9; Pet. Ex. 4 at 2-6; Pet. Ex. 18 at 9. Petitioner testified that her pain became intense in May 2015 associating the timeframe with graduation at the school where she worked. It was at this time that a co-worker suggested she go to a chiropractor. Tr. 39, 91-92, 104-05. D.L. testified that by the end of the weekend following the Tdap vaccine, petitioner's symptoms had resolved and her shoulder pain over the next few weeks was "an annoyance". Tr. 164, 168. Though D.L. stated petitioner was never without pain between December of 2014 and May of 2015 and was unable to fully participate in her exercise routine, he never suggested she seek medical care. He then stated it was May or June of 2015 when she would wake during the night crying in pain, and he noticed her having trouble putting on a seatbelt and coat and asking for help with household chores. Pet. Ex. 164, 166-67, 171-72, 174-75, 180, 187. A.E. stated that petitioner called her the day after the vaccine in November of 2014 and complained of flu like symptoms. She recalled telling petitioner to rest, take ibuprofen and ice her shoulder because in her experience, side effects from

---

[16] The records indicate that petitioner presented to Sutter in December of 2015 when she first saw Dr. Currier for a physical examination and did not mention the Tdap or any shoulder pain. Pet. Ex. 5 at 6-8. Adhesive capsulitis was first documented by Dr. Tweet on March 16, 2016. Pet. Ex. 4 at 5. Petitioner testified that the chiropractor mentioned frozen shoulder to her in September of 2015. Pet. Ex. 10 at 4; Tr. 41. A.E. testified that at some point she mentioned "frozen shoulder" to her mother. Tr. 133. When that was is unclear.

vaccinations typically resolve in a week or two.  Tr. 123-24, 126-27.  Initially, A.E. claimed she observed that petitioner was unable to put on a jacket or seatbelt in December of 2014 when she was home for school break. She then described these problems during petitioner's visit to Philadelphia in June of 2015 prompting her to examine petitioner's arm noting that petitioner was unable to "abduct or extend her arm above or behind her without excruciating pain." Tr. 125-26, 130-33, 148-50; Pet. Ex. 13 at 3. A.E. also believed that by June of 2015, petitioner had already undergone chiropractic care, cryotherapy, Bowen therapy and massages. However, at that time, petitioner had not yet undergone any treatment with any provider. A.E. mentioned "frozen shoulder" to petitioner at some point and suggested petitioner get a cortisone shot. Tr. 133, 149-50. A.E. added that if someone presented to the emergency room where she works with the complaints her mother had, she would have referred them to an orthopedic doctor.  Tr. 127-28. A.E.'s testimony of events is inconsistent with the timeline presented by petitioner and D.L. and more consistent with her observations being in June and December of 2015 rather than December of 2014. Tr. 125-26.

Finally, petitioner stated that she does "a lot of research on the internet."  Tr. 113. However, she did not conduct her first search of shoulder pain related to Tdap vaccine until October 21, 2015. Pet. Ex. 16 at 4. She conducted a second search on November 9, 2015, for "arm never recovered after tdap shot" visiting a website called "vactruth.com." *Id.* at 2-3. On January 27, 2016, petitioner searched "shoulder pain due to tdap" and "pain in shoulder when reaching back." *Id.* at 5-6. On February 11, 2016, she searched "shoulder pain from tdap" and "what type of doctor do I need to see for shoulder pain?" *Id.* at 7, 10. That day, she also visited a webpage discussing the Tdap vaccine and lasting shoulder pain, as well as a vaccine-injury attorney's website. *Id.* at 8-9. On March 19, 2016, petitioner watched a YouTube video on yoga for frozen shoulder. *Id.* at 11. A few days later, on March 21, 2016, petitioner searched "how to heal a frozen shoulder." *Id.* at 13. She also visited a website discussing frozen shoulder symptoms and treatment. *Id.* at 14. She searched for treatments for frozen shoulder on March 28, 2016. *Id.* at 12.

It is unclear when petitioner first learned of and equated shoulder pain with a vaccination. At her July 20, 2015 visit with the chiropractor, petitioner reported left arm pain since a Tdap vaccine in September of 2014.  However, petitioner received an influenza vaccine in September of 2014, and she received the subject Tdap vaccine on November 14, 2014.  Pet. Ex. 1 at 2.  Her petition was filed on November 1, 2017. ECF No. 1.

Succinctly, the medical records reveal petitioner to be an active participant in her own health care, communicating regularly with her physicians, researching health issues and medications, questioning laboratory results and updating her physicians on new and ongoing health issues.  This pattern of vigilance and regular use of the patient portal for advice and discussion with her health care professionals at no cost to her, both before and after the subject Tdap vaccine on November 14, 2014 undermines petitioner's claims that she suffered ongoing pain and debility affecting her daily activities and sleep beginning the day after receipt of the Tdap vaccine on November 14, 2014 and continuing through July of 2015 when she first sought treatment.

Since this Ruling focuses only on onset, viewing the record as whole through that lens, I find preponderant evidence to support petitioner's onset of pain in her left shoulder in February/March of 2015 which became intense in May of 2015 requiring care.

## V.      Conclusion

Upon detailed review of the record in its entirety, I find that petitioner's shoulder pain began in February/March of 2015 and became intense requiring care in May of 2015.

To continue pursuing her claim, petitioner must file an expert report which relies on the facts as found in this Ruling. Should petitioner's expert base his opinion on facts not substantiated by this Ruling, the expert's report will be disregarded. *See Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

Accordingly, the following is ORDERED:

> **By <u>Friday, March 24, 2023,</u> petitioner shall file a status report indicating how she intends to proceed.** Alternatively, petitioner shall file a motion to dismiss, a joint stipulation for dismissal, or a Motion for a ruling on the record, all of which will result in the dismissal of her claim.

**IT IS SO ORDERED.**

**<u>s/Mindy Michaels Roth</u>**
Mindy Michaels Roth
Special Master
